**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MELISSA MARIE ABLING,**

       **Plaintiff,**

    **v.**                            **Civil Action 2:18-cv-105
                                      Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

       **Defendant.**

<u>**OPINION AND ORDER**</u>

Plaintiff, Melissa Marie Abling, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI. For the reasons that follow, Plaintiff's Statement of Errors IS **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

**I.  BACKGROUND**

    **A.  Prior Proceedings**

Plaintiff filed an application for Disability Insurance Benefits, a period of disability, and Supplemental Security Income on July 22, 2014 under Titles II and XVI, alleging disability beginning on April 29, 2013. (Doc. 10-5, Tr. 204, PAGEID #: 277). She subsequently amended her alleged disability onset date to June 14, 2014. (*Id.*, Tr. 248, PAGEID #: 321). Her application was denied initially (Doc. 10-4, Tr. 127, PAGEID #: 199), and again on reconsideration (*Id.*, Tr. 141, PAGEID #: 213). After a hearing, Administrative Law Judge Regina Carpenter (the "ALJ") issued an unfavorable decision. (Doc. 10-2, Tr. 16–44, PAGEID #: 86–114). The Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision for

purposes of judicial review. (*Id.*, Tr. 1–3, PAGEID #: 71–73).

Plaintiff filed this action on February 9, 2018 (Doc. 3), and the Commissioner filed the administrative record on April 13, 2018 (Doc. 10). Plaintiff filed a Statement of Specific Errors (Doc. 15), the Commissioner responded (Doc. 16), and Plaintiff replied. (Doc. 17).

## B. Relevant Testimony at the Administrative Hearing

At the hearing, Plaintiff testified that she "can barely walk" and has trouble sitting and laying down for long periods of time, all of which prevented her from working. (Doc. 10-2, Tr. 62–63, PAGEID #: 132–33). Plaintiff further testified that she "was starting out with just using [her] cane," but that in the past year, she "had to go with a walker." (Tr. 63, PAGEID #: 133). The ALJ asked Plaintiff about her use of the cane and walker:

Q: How did you get the walker? Was it prescribed or did you pick it up?

A: My boyfriend was able to find it for me.

Q: Okay. And what about the cane? How long were you using the cane for?

A: Since all this started in 2014 that it got really bad.

(*Id.*).

As to Plaintiff's work history, Plaintiff testified that she last worked as a caregiver for Visiting Angels in June 2014, when she fell down the steps. (*Id.*, Tr. 55–56, PAGEID #: 125–26). Following her fall, Plaintiff told her treating physician, Dr Midcap, that her pain had improved, and asked to be released to work. (Tr. 57, PAGEID #: 127). When the ALJ asked why she requested to return to work, Plaintiff answered, "[b]ecause I had no choice. I had to make money. . ." (*Id.*). She testified, however, that Visiting Angels would not place her back on the schedule and that she could not find a less physically demanding job. (*Id.*, Tr. 57–58, PAGEID #: 127–28).

With regard to her mental health, Plaintiff testified that she takes medication for her depression, suffers anxiety attacks, and does not like to be around people. (*Id.*, Tr. 63, PAGEID #: 133). Plaintiff testified that seeing a psychiatrist or mental health counselor had not previously helped. (*Id.*, Tr. 64, PAGEID #: 134). When questioned about her pain, Plaintiff testified that she experiences pain in her back, hips, and groin, and that it feels like "needles" going through her legs. (*Id.*). Plaintiff also stated she can walk for approximately 15 feet at a time without needing to stop and that she can sit for only several minutes at a time without needing to change positions or take a break. (*Id.*, Tr. 65, PAGEID #: 135).

In terms of daily activities, Plaintiff testified that she generally does not leave the house apart from attending doctor appointments or picking up her prescriptions. (*Id.*). Her boyfriend of five years also comes to visit her for dinner on Sundays. (*Id.*, Tr. 68, PAGEID #: 138). She testified that she spends much of her day walking to and from her recliner and her bed. (*Id.*, Tr. 66, PAGEID #: 136). When asked whether she could help with daily household tasks, Plaintiff responded that she could help fold her clothes and cut up food, but that vacuuming the house causes too much pain. (*Id.*, Tr. 66–67, PAGEID #: 136–37).

During the hearing, a vocational expert ("VE") opined that, although Plaintiff could not perform past work, she could perform the sedentary and unskilled positions of "system monitor" and "document preparer." (*Id.*, Tr. 71, PAGEID #: 141).

### C. Relevant Medical Background

On January 16, 2014, Plaintiff presented as ambulatory to the Wheeling Hospital Emergency Department with complaints of atypical chest pain and shoulder pain. (Doc 10-7, Tr. 417, PAGEID #: 492). Her musculoskeletal exam revealed normal strength and her ability to move

all four extremities. (*Id*., Tr. 419–21, PAGEID #: 494–96). Other than a urinary tract infection, she was found to have no laboratory abnormalities of acute significance or other significant diagnoses. (*Id*.). Plaintiff also received treatment from January through June of 2014 after falling down the stairs while working as a caregiver at Visiting Angels. (*See generally id*., Tr. 386–405, PAGEID #: 461–480). In February 2014, Plaintiff again presented as ambulatory at the Wheeling Hospital Emergency Department. (*Id*., Tr. 350–53, PAGEID #: 425–28). Physical examination findings were within normal limits overall, including findings of normal gait and musculoskeletal strength. (*Id*.).

On March 2, 2014, Plaintiff underwent an MRI of the left knee, which revealed small knee joint effusion with mild chondromalacia patella. (*Id*., Tr. 377, PAGEID #: 452). On June 5, 2014, shortly before the amended onset date of disability, Ross A. Tennant, a family nurse practitioner, evaluated Plaintiff and found her to be in no acute distress while seated on the exam table and that she was able to transition from a seated to standing position without difficulty and ambulated with a steady gait. (*Id*., Tr. 386, PAGEID #: 461). Because Mr. Tennant noted that Plaintiff's symptoms had improved, he approved her request to return to work. (Tr. 387, PAGEID #: 462).

On June 14, 2014, the amended onset date of disability, Plaintiff presented again to the Wheeling Hospital Emergency Room. (*Id*., Tr. 380–83, PAGEID #: 455–59). The examining doctor found Plaintiff stable upon exam and noted she did not suffer from motor deficits. (*Id*)

Throughout June 2014, Plaintiff received treatment from her treating physician, Dr. Midcap, and his physician's assistant ("PA"), Chelsea Taylor. On December 5, 2014, Dr. Midcap noted on an administrative form that Plaintiff had normal grip strength, normal fine/gross manipulation, and normal range of motion except for some decreased low back range of motion.

(*Id.*, Tr, 536, PAGEID #: 611).  Dr. Midcap also reported other normal findings, including normal gait with no use of an assistive device for ambulation, as well as normal motor strength and reflexes.  (*Id.*, Tr. 536, PAGEID #: 611).  But, on the physical assessment, Dr. Midcap opined that Plaintiff could not lift more than 20 pounds or stand for longer than 10 minutes at a time and that she was "unable to bend, stoop, kneel, etc. due to pain and decreased ROM."  (*Id.*, Tr. 535, PAGEID #: 610).  Less than two weeks later, on December 16, 2014, Dr. Midcap opined on a prescription note pad that Plaintiff was disabled and unable to work.  (*Id.*, Tr. 640, PAGEID #: 715).  Dr. Midcap and his PA continued to treat Plaintiff throughout 2015 and did not report significant objective findings, other than findings of obesity.  For example, in March 2015, Plaintiff's mental status exam was grossly normal, as were findings regarding her gait, station, and neurology.  (*Id.*, Tr. 835–36, PAGEID #: 911–12).

On November 3, 2016, Dr. Midcap completed a "physical assessment" form, on which he opined that Plaintiff's impairments "constantly" interfered with the attention and concentration required to perform simple work-related activities.  (*Id.*, Tr. 692, PAGEID #: 767).  He also noted that Plaintiff needed to recline or lie down in excess of the typical 15-minute breaks throughout the workday; would likely be absent from work more than four times a month; and was unable to work.  (*Id*).  On that same day, however, Dr. Midcap examined Plaintiff and noted that apart from some decreased back range of motions, Plaintiff had a normal gait and no other significant objective findings.  (*Id.*, Tr. 885, PAGEID #: 961).

### D.  The ALJ's Decision

The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease with nerve root impingement; minimal degenerative joint disease of the left knee with

small effusion and mild chondromalacia; minimal wedging on T10-12; pain disorder; fibromyalgia; morbid obesity; hypertension; mild hepatomegaly and fatty liver disease; diabetes; mild obstructive sleep apnea; asthma; depression; anxiety; and panic disorder. (Doc. 10-2, Tr. 22, PAGEID #: 92). The ALJ concluded, however, that there was no medical opinion of record to indicate the existence of an impairment or combination of impairments that met or equaled in severity the level of the Listings of Impairments. (*Id.*).

Specifically, the ALJ explained that Plaintiff's mental symptomatology did not result in at least two limitations or one extreme limitation in the areas of activities of daily living, social functioning, concentration/persistence/pace, or episodes of decompensation as required in "paragraph B" of Listing 12.04 or Listing 12.06. (*Id.*, Tr. 25, PAGEID #: 95). Rather, the ALJ found Plaintiff had a "mild" restriction in her ability to understand, remember or apply information; "moderate" difficulties in her ability to interact with others; and "moderate" difficulties in her ability to concentrate, persist, or maintain pace. (*Id.*, Tr. 24, PAGEID #: 94). With regard to Plaintiff's ability to adapt and/or manage herself, the ALJ found that Plaintiff had "mild" difficulties." (*Id.*). Thus, the ALJ held that Plaintiff did not satisfy the "paragraph B" criteria. (*Id.*, Tr. 25, PAGEID #: 95).

As to Plaintiff's RFC, the ALJ opined:

[T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations: a sit/stand option allowing a change of position briefly for 1–2 minutes every 30 minutes; standing and walking limited to 10 minutes at a time; must use a cane while standing and walking; no crouching, crawling, or climbing ladders, ropes or scaffolds and no more than occasional balancing, stooping or climbing of stairs or ramps; no concentrated exposure to extreme heat and cold, wetness and humidity, vibration, respiratory irritants, or hazards such as dangerous moving machinery or unprotected heights; simple and routine instructions and tasks; no assembly line; no fast paced production requirements, and no more than occasional changes in

work routine or work setting; and no contact with the public and no more than occasional interaction with co-workers and supervisors.

(*Id.*, Tr. 25, PAGEID #: 95). After consideration of the evidence, however, the ALJ found that Plaintiff's "statements concerning the intensity and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.*, Tr. 27, PAGEID #: 97). The ALJ elaborated on how she reached that finding:

> While the claimant has alleged many symptoms, the evidence as a whole fails to support her allegations of a disabling condition to the degree she has alleged. Although she did complain of back pain to her examiners, the objective findings on examinations were primarily benign. As to fibromyalgia, while the evidence lacks a proper diagnosis or documentation, the undersigned has given the claimant the benefit of the doubt in finding this condition to be severe. While counsel referred to a finding of 0/5 strength in the lower extremities . . . there are other reports of near normal strength and normal gait throughout the record both before and after this finding. Although the claimant indicated at the hearing that she now uses a wheeled walker, the record indicates that it was given to her at her request in 2015, and several office visits after that date show normal gait and note no use of a wheeled walker. Additionally, the record shows that the claimant was released to return to work without restrictions, as per her request, and she indicated at the hearing that she has looked for work since then. . . .Overall, the hearing level evidence more than sufficiently supports the claimant's ability to perform the work related activities of the above-described residual functional capacity, which accommodates the claimant's severe impairments.

(*Id.*, Tr. 33–34, PAGEID #: 103–04).

As for the opinion evidence, the ALJ gave "significant weight" to the "return to work" recommendation provided by Ross A. Tennant, a family nurse practitioner with Corporate Health at Wheeling Hospital on June 5, 2014, finding it "supported by his objective findings upon exam." (*Id.*, Tr. 34, PAGEID #: 104). The ALJ more fully described how she reached this conclusion:

> [Tennant] assessed primarily normal findings upon exam of the claimant as to her knee condition. . . .The claimant was able to transition from a seated to stand position without difficulty and she ambulated with a steady gait. In fact, he noted

that the claimant requested to return to full work duty, and he reported that since the claimant's symptoms had improved, he would honor the claimant's request and release her to work without restrictions, beginning June 5, 2014. In fact, upon questioning the claimant at the hearing as to this evidence, she stated that she had no choice because she had to make money, but her employer would not put her back on the schedule, and she instead looked for other jobs. This evidence suggests that she did not consider her condition as disabling at that time as she has alleged overall.

(*Id.*, Tr. 34, PAGEID #: 104).

Further, the ALJ gave "partial weight" to Dr. Midcap's and his PA's December 5, 2014 "direct care provider form" because the ALJ found that their opinions were "generally consistent with the evidence as a whole at the time given" but found that "the other limitations were not supported by the evidence." (*Id.*). Dr. Midcap and his PA opined on the form that Plaintiff had decreased range of motion and an inability to bend, stoop, kneel, etc. due to pain. But, the ALJ found that the evidence as a whole did "not support a complete inability to perform those movements." (*Id.*). Similarly, Dr. Midcap and his PA reported Plaintiff had "normal gait", normal motor strength, sensory, and reflexes, and noted that Plaintiff "did not use an assistive device for ambulation." (*Id.*, Tr. 34–35, PAGEID #: 104–05).

In addition, the ALJ gave "little weight" to Dr. Midcap's December 16, 2014 statement, which indicated that Plaintiff was disabled and unable to work at that time. (*Id.*, Tr. 35, PAGEID #: 105). The ALJ found that Dr. Midcap's statement was "inconsistent with the detailed objective assessment [ ] given on December 5, 2014" and that it appeared that Dr. Midcap "based his December 16, 2014 statements upon subjective findings or the claimant's complaints." (*Id.*). Similarly, the ALJ gave "little weight" to Dr. Midcap's November 3, 2016 opinion, in which he reported that Plaintiff's impairments were severe

enough to interfere with attention and concentration required to perform simple work-related activities; she was unable to work; she would need to recline or lie down in excess of typical 15-minute morning and afternoon breaks; and she would likely be absent from work more than four times a month. (*Id.*). The ALJ gave this opinion little weight because she found that Dr. Midcap's office notes and the objective evidence of record did not support this opinion. (*Id.*).

Finally, the ALJ gave partial weight to the August 2014 light physical assessment of Atiya M. Lateef, M.D., as well as to the January 2015 light physical assessment of Thomas Lauderman, D.O. because the ALJ found "that the hearing level evidence, which reveal[ed] findings of morbid obesity and some degenerative changes of the spine, supports a reduction to the sedentary level of exertion and the additional limitations set forth in the residual functional capacity." (*Id.*).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v.*

9

*Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007)

(citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538

(6th Cir. 1986) (*en banc*)).  If the Commissioner's decision is supported by substantial evidence,

it must be affirmed, "even if a reviewing court would decide the matter differently."  *Id.* (citing 42

U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff asserts three assignments of error: (1) that the ALJ failed to follow the treating

physician rule, (2) that the ALJ chose to rely on the non-examining state agency physicians in

making the final RFC determination, and (3) that the ALJ failed to evaluate Plaintiff's use of a

walker.  (*See generally* Doc. 15).  The undersigned will address each argument in turn.

### A.  Treating Physician

In her first statement of error, Plaintiff contends that the ALJ incorrectly evaluated Dr.

Midcap's treating source opinion.  (*Id.* at 11–13).  Plaintiff alleges specifically that the ALJ's "few

reasons" for failing to give controlling weight to Dr. Midcap were not supported by the record

evidence.  (*Id.*).  Plaintiff also contends that the ALJ was not qualified to interpret the medical

evidence and therefore improperly relied on that evidence to discount Dr. Midcap's opinions.  (*Id.*

at 13).

As an initial matter, "[i]t is the Commissioner's function to resolve conflicts in the medical

evidence[.]"  *Ray v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 718, 727 (S.D. Ohio 2013) (citing

*Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987)).  Accordingly,

when medical sources rely on the same evidence and reach different conclusions, it is the ALJ's

job to resolve the inconsistency.  *See, e.g.*, *Goodson v. Chater*, No. 95-6582, 1996 WL 338663, at

*1 (6th Cir. June 17, 1996). With this standard in mind, the undersigned turns to Dr. Midcap's opinions.

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has

been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ did not give controlling weight to Dr. Midcap's opinion, explaining that Dr. Midcap's opinions were inconsistent with the totality of the record evidence, including his own objective findings and numerous other benign objective findings. (Doc. 10-2, Tr. 29–32, 34–35, PAGEID #: 99–102, 104–05). As an initial matter, the ALJ—not a doctor—is ultimately responsible for deciding whether an impairment results in work-related limitations. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157, (6th Cir. Aug. 18, 2009) (finding that an "ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."). Plaintiff argues that some of Dr. Midcap's findings are consistent with a finding of disability (*See* Doc. 15 at 11–13), but this misses the mark. While it may be true that some of Dr. Midcap's evaluations could be consistent with a finding of disability, that is not the question here. Instead, the Court must decide whether the ALJ properly evaluated Dr. Midcap's opinions.

The ALJ cited numerous findings in the medical record that Plaintiff was ambulatory or had a normal gait, and had normal musculoskeletal and neurological examinations, normal strength, full range of motion of all extremities, and no motor deficits. (*See* Doc. 10-2, Tr. 29–32, PAGEID #: 99–102). Plaintiff argues that only the state agents' opinions differed from Dr. Midcap's. (Doc. 17 at 2). The ALJ, however, found that Dr. Midcap's own opinions were not only inconsistent with objective record evidence, but were also internally inconsistent. For example, on December 5, 2014, Dr. Midcap noted numerous normal findings, including normal gait with no use of an assistive device for ambulation. (*Id.*, Tr. 34, PAGEID #: 104). On the

assessment, however, Dr. Midcap concluded that Plaintiff could not lift more than 20 pounds or stand for longer than 10 minutes and that she was "unable to bend, stoop, kneel, etc." due to pain and decreased range of motion. (*Id*.). The ALJ gave Plaintiff "the utmost benefit of the doubt" and included Dr. Midcap's lifting and standing limitations in her RFC finding. (*Id*., Tr. 34–35, PAGEID #: 104–05). Only two weeks later, Dr. Midcap opined on a prescription note pad that Plaintiff was disabled and unable to work. (*Id*., Tr. 35, PAGEID #: 105). The ALJ found Dr. Midcap's opinion "inconsistent with the detailed objective assessment" he gave on December 5, 2014 and noted that it appeared that Dr. Midcap based his December 16, 2014 statements "upon subjective findings or the claimant's complaints." (*Id*.).

Similarly, on November 3, 2016, Dr. Midcap completed a physical assessment form, noting that Plaintiff's impairments "constantly" interfered with the attention and concentration required to perform simple work-related activities and that Plaintiff needed to recline or lie down in excess of the typical 15-minute breaks throughout the work day. (*Id*., Tr. 35, PAGEID #: 105). Yet, on that same day, Dr. Midcap also examined Plaintiff and noted that other than some decreased back range of motion, Plaintiff had a normal gait and no significant objective findings. (*Id*.). The ALJ therefore concluded that Dr. Midcap's opinion was entitled to "little weight" because "his office notes and the objective evidence of record clearly do not support these opinions." (*Id*.).

Plaintiff cites to various abnormal findings from the record to support her claim and contends that the ALJ erroneously concluded that other record evidence does not support Dr. Midcap's opinions. (*See* Doc. 15 at 11–13). But the ALJ is not required to discuss every piece of evidence in the record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). And, an abnormal diagnostic study or finding alone generally does not indicate the level

of severity of a condition in any individual.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

Thus, although Plaintiff may disagree with the ALJ's conclusion, the ALJ's decision to reject Dr. Midcap's opinion was appropriate because she found it internally inconsistent, unsupported by objective evidence, and inconsistent with the other evidence in the record.  Further, the ALJ's explanation provided sufficient detail to satisfy the good-reasons requirement.  *See Henderson v. Astrue*, No. 10-CV-238-JMH, 2011 WL 3608164, at *3 (E.D. Ky. Aug. 16, 2011) (noting good reasons include, *inter alia*, "a treating physician's opinion that contradicts other medical evidence in the record[] and a treating physician's opinion that contradicts other opinions of the same treating physician already in the record").  The ALJ therefore did not err in declining to assign Dr. Midcap's opinion controlling weight, and the decision to do so does not undermine Plaintiff's RFC.

### B. Other Opinion Evidence

Pursuant to the Social Security regulations, the ALJ is required to evaluate every medical opinion and consider a variety of non-exhaustive factors in deciding what weight to assign.  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  Here, Plaintiff alleges that the ALJ erroneously relied on the state agency physicians' opinions because they did not have an opportunity to review all the evidence.  (Doc 15 at 13–14).  Plaintiff also contends that the ALJ gave the "most weight to a nurse's work release" and argues that Mr. Tennant's work release "should not constitute substantial evidence." (*Id*. at 14).

As to the state agency physicians, there is "no categorical requirement that [a] non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive case record.'"

*Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting SSR 96-6p).  While

Plaintiff is correct that she submitted additional medical evidence after the state agency physicians

reviewed the record, the ALJ properly considered the recent evidence in the record.  The ALJ did

not rely solely on the state agency physicians' opinions in determining Plaintiff's RFC and also

considered recent evidence from the record.  Indeed, the ALJ found that Plaintiff had greater

limitations than the state agency physicians opined.   (Doc. 10-2, Tr. 35, PAGEID #: 105).

Accordingly, it was appropriate for the ALJ to consider the state agency physicians' opinions as

part of the substantial evidence that supported her opinion.  *See, e.g.*, *McGrew v. Comm'r of Soc.

Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (rejecting plaintiff's argument that the ALJ improperly

relied on the state agency physicians' opinions because they were out of date, holding that that the

ALJ considered medical examinations that occurred after the state agency physician's assessment

and "took into account any relevant changes in [plaintiff's] condition.").

     As to the nurse practitioner's work release, the ALJ properly considered the release, along

with opinion evidence and the record evidence as a whole, and reasonably accommodated

Plaintiff's work-related limitations resulting from her impairments.  Although the work release

pre-dated Plaintiff's "amended" alleged onset of disability, the ALJ reasonably found that it

"supports [Plaintiff's] ability to perform work-related activities" as set forth in the RFC, which

was based on the totality of the evidence.  (Doc. 10-2, Tr. 33–34, PAGEID #: 104–05).  And, while

Mr. Tennant released Plaintiff without restrictions, the ALJ limited Plaintiff to a reduced range of

sedentary work.  (*Id.*, Tr. 25, PAGEID #: 95).

     At bottom, even if it is true that the record contains some evidence that may support

Plaintiff's argument, the ALJ's findings are "not subject to reversal merely because substantial

evidence exists in the record to support a different conclusion." *Mixon v. Colvin*, 12 F. Supp. 3d 1052, 1064 (S.D. Ohio 2013). Rather, it is the ALJ's "function to resolve conflicts in the evidence, *see Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 928 (6th Cir.1987)," and that is exactly what the ALJ did here.

### C. Plaintiff's Use of a Walker

Finally, Plaintiff contends that the ALJ erred in formulating her RFC opinion because she failed to include Plaintiff's need for a walker. (Doc. 15 at 14–16). "Where the use of a walker is part of the record, the ALJ is obligated to consider whether this factor would have an impact on the plaintiff's RFC." *Dow v. Comm'r of Soc. Sec.*, 2014 WL 4377820 (S.D. Ohio Sept. 4, 2012). Here, however, Plaintiff concedes that she only submitted evidence regarding her requests for and use of a walker after the ALJ's decision. (Doc. 15 at 15). Further, Plaintiff does not allege that she was prescribed a walker, nor does the evidence Plaintiff later submitted to the Appeals Council demonstrate that she was prescribed a walker. (Doc. 10-2, Tr. 11, PAGEID #: 81). Plaintiff's supplemental evidence to the Appeals Council consists only of a note from Dr. Midcap, which states simply that Plaintiff became "more unsteady on her feet" in October 2016, that she "began to use a walker after this," and notes that Plaintiff states that "she uses the walker at all times even at home." This evidence, which relies largely on Plaintiff's own subjective statements, is insufficient to establish that Plaintiff's walker is medically required. *See* SSR 96–9p ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed . . .").

Regardless, this evidence was not presented to the ALJ at the time of the hearing and the ALJ

was therefore left only to consider Plaintiff's subjective complaints of disability, which she did. For instance, the ALJ noted that Plaintiff testified to having used a cane, and, more recently, a walker she received from her boyfriend. (Doc. 10-2, Tr. 27, PAGEID #: 97). The ALJ further explained that "while Plaintiff indicated at the hearing that she now uses a wheeled walker, the record indicates that it was given to her at her request in 2015, and several office visits after that date show normal gait and note no use of a wheeled walker." (*Id*., Tr. 34, PAGEID #: 104). The ALJ "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Here, the ALJ properly considered Plaintiff's subjective statements and weighed them against the objective evidence as a whole.

Moreover, in reaching her conclusion about Plaintiff's abilities, the ALJ accommodated Plaintiff's use of a cane in the RFC. (Doc. 10-2, Tr. 25, PAGEID #: 95). Contrary to Plaintiff's assertions otherwise (Doc. 17 at 2), this is therefore not a case where the ALJ entirely overlooked references in the record or in relevant testimony to the plaintiff's use of a cane or a walker. *See, e.g.*, *Penn v. Astrue*, No. 2:09-cv-00169, 2010 WL 547491 (S.D. Ohio Feb. 12, 2010) ("The consistent reference to the use of a cane (or a walker) . . . is enough to trigger an obligation on the part of the Commissioner to decide if such use is medically necessary and, if so, to have included that factor in the RFC analysis. The complete absence of any direct consideration of this issue . . . leads to the conclusion that this issue was simply overlooked.").

Here, the ALJ noted that Plaintiff indicated that she used an assistive device for "prolonged" ambulation rather than "at all times." (*Id*., Tr. 30, PAGEID #: 100). She also noted Plaintiff's recent use of a walker in her opinion. (*Id*., Tr. 34, PAGEID #: 104). As part of her determination,

the ALJ also properly considered Plaintiff's daily activities, which included performing household chores such as doing laundry, dusting, sweeping, driving, shopping, and vacuuming (albeit with difficulty). (Doc. 10-2, Tr. 24, PAGEID #: 94). Therefore, based on the evidence available to her at the time, the ALJ accounted for any limitations Plaintiff had by limiting her to a sit/stand option allowing for a change of position briefly for 1 to 2 minutes every 30 minutes; standing and walking 10 minutes at a time; using a cane while standing and walking; and other postural limitations. (*Id.*, Tr. 25, PAGEID #: 95).

In light of the above, the undersigned finds that the "record as a whole"—including Plaintiff's own statements, her activities of daily living, and the medical record—contain substantial evidence to support the ALJ's RFC decision. *See Berry v. Astrue*, No. 1:09cv000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010).

## IV.    CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors (Doc. 15) is **OVERRULED** and judgment shall be entered in favor of Defendant.

IT IS SO ORDERED.


Date:  August 29, 2018                              /s/ Kimberly A. Jolson
                                                    KIMBERLY A. JOLSON
                                                    UNITED STATES MAGISTRATE JUDGE